UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

MANUEL DE JESUS ROSARIO,

         Plaintiff,

   -v-                                No.  15 CV 6049-LTS-DCF

MIS HIJOS DELI CORP., PALMA
GROCERY CORP., 251 E. 123rd ST.
REALTY, LLC, JOSE PALMA, LEONIDA
COLLADO, and JUNIOR PALMA,

         Defendants.

-------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

        Plaintiff Manuel De Jesus Rosario brings this action against defendants Mis Hijos

Deli Corp. ("Mis Hijos"), Palma Grocery Corp. ("PGC"), 251 E. 123rd St. Realty, LLC

("Realty"), Jose Palma ("Palma"), Leonida Collado, and Junior Palma (collectively

"Defendants")  for failure to pay minimum wage and the required rate for overtime pay in

violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C § 201 et seq., and for violations of

minimum wage, overtime, wage notice, spread-of-hours, and split-shift pay requirements under

New York Labor Law ("NYLL").  Defendants Collado, Palma, PGC, and Realty (collectively,

"Moving Defendants") have moved for summary judgment dismissing all federal and state law

claims against them.  (Docket Entry Nos. 70, 74, 79.)

        The Court has subject matter jurisdiction of this action under 28 U.S.C. sections

1331 and 1367.

        The Court has considered the submissions of all parties carefully and, for the

following reasons, grants the motions in part and denies them in part.

<u>BACKGROUND</u>[1]

Palma and Collado were in an unmarried romantic relationship resulting in three children, including Junior Palma. (Collado Tr., Docket Entry No. 97-15, at 9:22-10:10, 11:18-14:8.) They opened PGC, taking over the space of a previous grocery store at 251 E. 123rd Street, New York, New York (the "Building"). (<u>Id.</u> at 14:12-23; Palma Tr., Docket Entry No. 97-26, at 15:24-17:2.) Palma then purchased the Building, which comprised four stories of apartments and a retail story on the ground floor, sometime between 1979 and 1981. (Realty's 56.1 St. ¶ 4; Collado Tr. at 14:12-23; Palma Tr. at 15:15-23, 19:15-20; <u>see also</u> Pl.'s Opp'n to Realty's 56.1 St. ¶¶ 2-6.) Collado was listed as PGC's sole stockholder in a Corporate Report filed with the New York State Division of Alcoholic Beverage Control on March 19, 1985, and was listed as PGC's chief executive officer in the New York Department of State's corporation database.[2] (Palma's 56.1 St. ¶ 15; Collado and PGC's 56.1 St. ¶¶ 8, 9; <u>see also</u> Pl.'s Opp'n to Palma's 56.1 St. ¶ 15.) For some period of time, Collado and Palma both worked at the store. (Collado Tr. at 14:24-15:1.) Around 1981, Collado and Palma ended their romantic relationship and, according to Collado's testimony, from that point forward Collado ran PGC without Palma's involvement. (Collado Tr. at 15:13-19, 18:21-24; Palma Tr. at 24:21-25:1.) Collado

---

[1]    The material facts recited herein are undisputed unless otherwise indicated. Facts recited as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements ("Palma's 56.1 St.," "Realty's 56.1 St.," "Collado and PGC's 56.1 St.," "Pl.'s Opp'n to Palma's 56.1 St.," "Pl.'s Opp'n to Realty's 56.1 St.," or, "Pl.'s Opp'n to Collado and PGC's 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions.

[2]    Plaintiff objects to Defendants' submission of the printout from the New York Department of State's corporation database (Rodriguez Decl., Ex. 11, Docket Entry No. 81-3, at page 13), characterizing the document as "inadmissible," but does not otherwise explain the grounds for its objection. (<u>See</u> Pl.'s Opp'n to Collado and PGC's 56.1 St. ¶ 9.)

commenced paying Palma rent in cash.  (Collado Tr. at 19:8-10.)  Collado recalls that the rent was initially $2,500 per month in consideration of the parties' relationship and was eventually increased to $3,000.  (Id. at 18:24-19-7.)  Palma recalls the rent as being set at $2,000, and testified that PGC was often unable to pay the whole sum.  (Palma Tr. at 26:17-24; see Pl.'s Opp'n to Collado and PGC's 56.1 St., Additional Statements of Material Fact ¶ 50.)  Palma testified that he "could get a little better" rent for the store on the open market.  (Palma Tr. at 85:8-21.)  Palma was unable to recall when the last written lease was signed and testified that he did not conduct a search for a lease agreement with either PGC or Mis Hijos, the grocery store that was later operated in the premises.  (Pl.'s Opp'n to Realty's 56.1 St., Additional Statements of Material Fact ¶¶ 37-38.)

Palma testified that he relocated to Santo Domingo in the Dominican Republic in the 1980s and returns to the United States about once a year.  (Palma Tr. at 24:16-19.)  From 2009 until 2013, Palma received an annual salary from PGC ranging from $8,450 to $34,450.  (See Pl.'s Opp'n to Palma's 56.1 St., Additional Statements of Material Fact ¶¶ 6, 7, 10, 13, 16, 19.)

In 1995, Plaintiff was hired to work at PGC by the manager, Reuben, with Palma's authorization.  (Rosario Tr., Docket Entry Nos. 97-13 and 97-14, at 34:19-36:19; Pl.'s Opp'n to Palma's 56.1 St. ¶ 15.)  In contrast to Plama's testimony that Palma has principally spent his time in the Dominican Republic at all relevant times, Plaintiff alleges that Palma was frequently at PGC and was involved in its operation and management.  According to Plaintiff, Reuben set his schedule and, with Palma's approval, also set his wages, which were initially $200 per week.  (Palma's 56.1 St. ¶ 16; Pl.'s Opp'n to Palma's 56.1 St. ¶ 16; Rosario Tr. at 35:15-37:4; Collado Tr. at 101:11-14.)  Plaintiff testified that, during the period in which Reuben

managed PGC, Palma was "always" at PGC, would pay him when the manager was not there, and "told [him] what he had to do in the store." (Pl.'s Opp'n to Palma's 56.1 St. ¶ 16; Rosario Tr. at 37:5-19.) According to Plaintiff, starting in 1995, Palma allowed Plaintiff to eat a sandwich from PGC at lunch. (Rosario Tr. at 77:3-16.) Plaintiff testified that when Plaintiff asked Junior Palma, who replaced Reuben as manager in 2003, for a raise and a MetroCard as part of his compensation, Junior Palma, in turn, asked Palma for approval. (Id. at 77:17-78:24.)

At some point, Palma transferred ownership of the Building to Realty, a New York limited liability company. (Realty's 56.1 St. ¶¶ 1-2; Palma Tr. at 78:7-10; see also Pl.'s Opp'n to Realty's 56.1 St. ¶¶1-2.[3]) Realty's Articles of Organization recite that "[a]t the time of its formation, [Realty] had at least one member, to wit: Jose Palma." (Docket Entry No. 72-3.) According to Realty's Schedule E to Palma's personal tax returns, Realty had gross revenues of $128,905 in 2012, $175,424 in 2013, $193,543 in 2014, and $223,271 in 2015. (Realty's 56.1 St. ¶ 15; see Pl.'s Opp'n to Realty's 56.1 St. ¶ 15.) Residential rent was generally paid in cash and several of Palma's family members resided in the Building for free. (Pl.'s Opp'n to Realty's 56.1 St. ¶ 15.)

The parties proffer conflicting evidence as to who served as the superintendent, on-site manager, or custodian for the Building. Junior Palma, Collado, and Palma testified that a woman named Francisca Polanco was the building superintendent until her death. (Junior Palma

---

[3] Plaintiff objects to Defendants' submission of a printout from the New York State Department of State's database for Realty (Rodriguez Decl., Ex. 1, Docket Entry No. 72-1) as "inadmissible," but does not otherwise explain the grounds for its objection. (See Pl.'s Opp'n to Realty's 56.1 St. ¶ 1.) Plaintiff also objects to Defendant's use of Palma's testimony to establish that Realty owns the Building, arguing that the testimony violates the best evidence rule, but seemingly assumes in arguments proffered in its briefing papers that Palma owns the Building through Realty. (See Pl.'s Opp'n to Realty's 56.1 St. ¶ 2; see also Pl.'s Opp'n at 12-13.)

Tr. at 35:16-36:21; Collado Tr. at 90:21-92:4; Palma Tr. at 61:9-63:10.)  According to Junior Palma, Palma is now the superintendent despite living in the Dominican Republic, while a woman named Janet Rivera cleans the Building, removes the trash, and makes repairs.  (Junior Palma Tr. at 36:22-38:24; Collado Tr. at 92:8-23; Palma Tr. at 61:9-63:10.)  Palma testified that Rivera receives a $200 credit towards monthly rent for these duties.  (Palma Tr. at 62:13-18.)  Annual reports from 2014-2016 submitted to the New York City Department of Housing Preservation and Development list Junior Palma as the on-site manager.  (See Docket Entry Nos. 101-5, 101-6, and 101-7.)

Plaintiff testified that, although "[he] didn't work for the building," his duties included mopping the Building's stairs and hallways, removing trash from the Building, and, when necessary, clearing snow.  (Rosario Tr. at 60:15-61:10.)  Plaintiff shared these duties with another employee, Emilio, who would be sent to the Building if Plaintiff was unavailable.  (Id. at 65:5-14.)  Until his departure from PGC in 2003, Reuben would generally send Plaintiff to perform work in the Building three to four times per week.  (Id. at 63:12-64:5.)  After 2003, Collado sent Plaintiff to perform work in the Building.  (Id. at 64:14-21.)  When asked at his deposition whether Reuben supervised his work at the building, Plaintiff responded that "[Rueben] saw it, but he had nothing to say, because it was well done."  (Id. at 66:13-17.)  When asked whether Palma ever supervised his work at the Building, Plaintiff responded that Palma saw Plaintiff performing the work, but that Plaintiff did not need supervision because "[e]verything I do is well done."  (Id. at 70:2-10.)

Collado worked with an attorney, Mitchell Mund, who was involved in "setting the manner and method of payment to [her] employees" and "advise[d] [her] about how to pay [her] employees."  (Collado Tr. at 25:6-16; Collado and PGC's 56.1 St. ¶ 17; see also Pl.'s

Opp'n to Collado and PGC's 56.1 St. ¶ 17.)   When asked at her deposition whether she had wage and hour records for Plaintiff, she responded that she "had an attorney[, Mund,] for that." (Collado Tr. at 24:5-10.)  The record includes payroll summaries reflecting what appear to be weekly sums paid to various individuals, but not hours worked.  (Docket Entry Nos. 97-43 to 97-64.)

Collado "gave up" PGC and surrendered her lease in May 2013.  (Collado Tr. at 31:9-20; Collado and Realty's 56.1 St. ¶ 13; Junior Palma Tr. at 13:16-18; see also Pl.'s Opp'n to Collado and Realty's 56.1 St. ¶ 13 (objecting to Defendants' Rule 56.1 statement as a characterization of deposition testimony).)  PGC then closed for renovations and reopened with a new sign under the name Mis Hijos.  (Rosario Tr. at 70:18-71:20; Collado and PGC's 56.1 St. ¶¶ 5-7; see also Pl.'s Opp'n to Collado and PGC's 56.1 St. ¶¶ 5-7 (stating that Plaintiff did not testify that the new sign was specifically for Mis Hijos).)  Plaintiff continued to work at the premises.  (Compl., Docket Entry No. 5, ¶ 23.)  Mis Hijos was incorporated on May 21, 2013.  (Collado and PGC's 56.1 St. ¶ 4; Pl.'s Opp'n to Collado and PGC's 56.1 St. ¶ 4 (objecting to the cited printout from the New York Department of State's corporations database, Decl. of Argilio Rodriguez, Ex. 5, Docket Entry No. 81-2, as "inadmissible" but providing no further explanation).)  Plaintiff estimates that Mis Hijos reopened within two weeks after PGC's closure, whereas Junior Palma places its opening in June 2013.  (Collado and PGC's 56.1 St. ¶ 7; Rosario Tr. at 71:9-17; see Pl.'s Opp'n to Collado and PGC's 56.1 St. ¶ 7.)

Palma testified that he established Mis Hijos for his children, signing the necessary documents and then returning to the Dominican Republic.  (Palma's 56.1 St. ¶ 10; Pl.'s Opp'n to Palma's 56.1 St. ¶ 10: Palma Tr. at 30:18-31:7.)  Palma represented that, although he is the sole "registered owner with the State of New York," he gave the business to Junior

Palma, who is the true owner, and that he does not know how many employees Mis Hijos has because he only comes to the United States to visit. (Palma Tr. at 31:8-15, 114:14-17.) Realty charged Junior Palma $3,500 a month in rent to help him start the business, with the prospect that the rent might increase. (Id. 87:1-9.)

In Mis Hijos's application for its liquor license, Jose Palma represented that he devoted 50 hours per week to Mis Hijos's business and that he "[oversaw] daily operation of the business." (Docket Entry No. 97-1.) Mis Hijos's tax returns for 2013 and 2014 list Palma as the sole shareholder. (Pl.'s Opp'n to Palma's 56.1 St., Additional Statements of Material Fact ¶ 28.)

In Defendants' response to Plaintiff's interrogatories, which were sworn to by Junior Palma, Defendants identified Palma, along with others, as a person believed to have "participated in, contributed to, or [been] in a position to decide the compensation of Plaintiff," as "responsible for supervising Plaintiff during their [sic] employment with [Mis Hijos,]" and as having "prepared and/or distributed paychecks or payments" with respect to Plaintiff's employment at Mis Hijos. (Responses to Interrogatories, Docket Entry No. 97-11, Nos. 4, 8, 12.)

Defendants assert that Palma spent a total of 25 days in the United States between September 20, 2012, and September 13, 2016, whereas Plaintiff asserts that Palma spent 62 days in the United States during that period.[4] (Palma's 56.1 St. ¶ 13; Pl.'s Opp'n to Palma's 56.1 St. ¶ 13.) Plaintiff testified in 2016 that he had last seen Palma about two years before and that the

---

[4] Both parties base their accounting of Palma's time in the United States on their examination of his passport. (Docket Entry No. 76-6.) The copy of Palma's passport submitted to the Court is not sufficiently clear to corroborate either assertion, but the difference between 25 and 62 days is not material to the Court's decision.

last time he saw him before that meeting was when Palma became a citizen in 2012.  (Palma's 56.1 St. ¶ 12; see Pl.'s Opp'n to Palma's 56.1 St. ¶ 12.)

Palma and Junior Palma each received an annual salary from Mis Hijos of $19,500 and $11,580, respectively, in 2013, $33,800 and $16,640 in 2014, and $33,800 and $18,188 in 2015.  (Pl.'s Opp'n to Palma's 56.1 St., Additional Statements of Material Fact ¶¶ 22-27.)

Mund prepared tax returns for Realty, PGC, and Palma's family members, including his sons David and Junior, and Collado (PGC Account Ledgers, Docket Entry No. 97-65) and he continued to prepare returns for Mis Hijos, recording his transactions from June 2013 through August 2016 with all Defendants on a ledger entitled "Mis Hijos Deli Corp." with payments accompanied by the code "1109" (Mis Hijos Accountant Ledgers, Docket Entry No. 97-66).

Plaintiff filed his complaint against Defendants on August 3, 2015, at which time Plaintiff was still employed by Mis Hijos.  (Compl. ¶ 23.)

DISCUSSION

Collado, Palma, Realty, and PGC move for summary judgment dismissing the federal FLSA and certain of the New York State Labor Law claims against them.  Defendants argue that Realty is not an enterprise engaged in interstate commerce subject to the FLSA, that the FLSA claims against Collado, Palma, and PGC are time barred as to conduct prior to August 2013, and that Collado, Palma, PGC, and Realty are not employers under the FLSA and NYLL.

Summary Judgment Standard

The pending motions are brought pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.  Under Rule 56(a), summary judgment is appropriate when the "movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of demonstrating the absence of any material issues of fact, <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986), and the court must be able to find that, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party."  <u>Marvel Entertainment, Inc. v. Kellytoy (USA), Inc.</u>, 769 F. Supp. 2d 520, 523 (S.D.N.Y.2011) (quoting <u>Heublein v. United States</u>, 996 F.2d 1455, 1461 (2d Cir.1993)) (internal quotation marks omitted).  A fact is considered material "if it might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Holtz v. Rockefeller & Co. Inc.</u>, 258 F.3d 62, 69 (2d Cir.2001) (internal quotation marks and citations omitted).  "[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist."  <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir.2010) (quoting <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1456 (2d Cir. 1995)) (internal quotation marks and citations omitted).

The Court now turns to the Moving Defendants' various arguments for dismissal of Plaintiff's claims.

Whether Realty was an Enterprise Engaged in Interstate Commerce
<u>Whose Revenues Exceed the FLSA Statutory Threshold</u>

To succeed on an FLSA minimum or overtime wage claim, a Plaintiff must establish: (1) that he is an FLSA-covered employee, personally engaged in or employed by an enterprise engaged in interstate commerce; (2) the existence of an employer-employee relationship between the plaintiff and the defendant; and (3) that he worked hours for which he was not properly compensated in accordance with the FLSA's relevant substantive requirements. <u>See</u> <u>Jian Zhong v. August Corp.</u>, 498 F. Supp. 2d 625, 628 (S.D.N.Y. 2007).  If a plaintiff is not

personally engaged in interstate commerce,[5] he may still be an FLSA-covered employee if he is employed by an enterprise engaged in interstate commerce with at least $500,000 in annual gross volume of sales.  See 29 U.S.C. § 203(s)(1)(A); see Solis v. Cindy's Total Care, Inc., No. 10 Civ. 7242, 2012 WL 28141, at *15-16 (S.D.N.Y. Jan. 5, 2012).  Defendants contend that Plaintiff is not an FLSA-covered employee with respect to Realty because Realty did not generate $500,000 in annual gross sales during any relevant period.  Plaintiff asserts that the evidence of revenue proffered by Defendants is not credible, that the Court should account for the below-market rent offered to Palma's family members at full market value, and that, even if Realty does not meet the revenue threshold, Realty and PGC's, and later Mis Hijos's, revenue should be aggregated because the businesses constitute a single enterprise under the FLSA.

Although Defendants have proffered tax returns showing that Realty earned substantially less than $500,000 in the years relevant to this action, Plaintiff contends that the Court should infer that the tax returns dramatically understate Realty's annual gross revenue because Realty charged PGC and Mis Hijos below market rent and several family members lived in the Building for free, and because Realty has an incentive to underreport its income to reduce its tax liability.  (Pl.'s Mem. of Law in Opp'n to Defs.' Mots. for Summ. J. ("Pl.'s Opp'n"), Docket Entry No. 93, at 18-19.)  Plaintiff points out inconsistencies between Palma's testimony and documentary evidence with respect to his ownership and role at Mis Hijos to cast doubt on Palma's credibility and asserts that Realty's inability to produce a written lease and exclusive acceptance of cash for rent, and the dearth of any documentary evidence indicating the receipt of

---

[5]      A plaintiff may be an individually covered employee if he or she "personally engaged in interstate commerce or in the production of goods for interstate commerce."  Shim v. Millennium Grp., No. 08-CV-4022, 2009 WL 211367, at *2 (E.D.N.Y. Jan 28 2009)) (internal quotation marks omitted).  Plaintiff does not contend that he was such an employee.

rent payments, relieves Plaintiff of the burden to produce evidence demonstrating that Realty's annual gross income exceeded the $500,000 threshold. Plaintiff cites De Xiong Pan v. Wei Plumbing, Inc. for the proposition that "[t]o require that plaintiffs make a precise showing of defendant's gross annual revenues, despite defendants' blatantly inadequate record-keeping, would unfairly penalize plaintiffs for their employer's poor business practices and perversely incentivize bad record-keeping among employers hoping to shield themselves from FLSA claims." No. 12 CV 1781 MHD, 2013 WL 6053496, at *12 (S.D.N.Y. Nov. 13, 2013).

The defendant in Xiong Pan, as the quoted language suggests, did not keep accurate records of revenues. The evidence before the court in that case also suggested underreporting of income on tax returns and undisclosed cash income and bank accounts. Id. at *11-12. There was before the court, however, sufficient evidence of revenues to place the company over the threshold for at least one year, and circumstantial evidence from which the factfinder could properly have made credibility findings and drawn inferences supporting conclusions that the threshold was exceeded in the other years at issue as well. See id. Summary judgment was therefore denied.

Here, by contrast, Plaintiff has proffered no evidence from which computations of actual revenue exceeding $500,000 could properly be made, relying instead on speculation as to rental market values higher than the rates charged, and further speculation regarding possible falsification of the returns. Speculation is an improper basis for the relevant calculations and is insufficient to defeat a motion for summary judgment. See Jian Long Li v. Li Qin Zhao, 35 F. Supp. 3d 300, 306 (E.D.N.Y. 2014) (finding that the plaintiff failed to raise a genuine issue of material fact and stating that "[i]t is not enough for [the plaintiff] to argue that the tax returns did not credibly report the [defendant's] gross sales, when considered alongside its costs, without

furnishing 'concrete' and 'affirmative' evidence to support the conclusion that the [defendant's] gross sales were more than $500,000 every year.").

To the extent Plaintiff is arguing that the Court should account for revenue that Realty could have earned, but did not because it charged below-market rent to PGC, Mis Hijos, and Palma's family members living in the Building's residential apartments, he has provided no authority for this proposition and the Court declines to speculate on what revenue Realty might have earned in such circumstances.  See Millennium Pipeline Co., LLC v. Certain Permanent and Temp. Easements, 552 Fed. App'x 37, 39 (2014) (stating that "speculation is insufficient to defeat summary judgment").  Indeed, Department of Labor regulations provide that gross annual volume should be calculated based on the price a customer actually paid for the relevant good or service, including in the property leasing context.  See 29 C.F.R. §§ 779.258, 779.259(a).

Plaintiff has thus failed to establish that Realty, standing alone, is a covered employer on the basis of its revenues, or even to frame a triable issue of fact in that respect. Plaintiff also argues, however, that Realty constituted a single enterprise with PGC and, later Mis Hijos (collectively, the "Delis"), and that their annual revenues should be aggregated for the purposes of the gross revenue threshold.

Single Enterprise Theory

Courts will treat multiple entities as a single enterprise for FLSA purposes if "(1) the entity or entities . . . engage in related activities, (2) performed through unified operation or common control, (3) for a common business purpose."  See Garcia v. Serpe, No. 3:08-CV-1662(VLB), 2012 WL 380253, at *4, 8 (D. Conn. Feb. 6, 2012) (quoting Bowrin v. Catholic Guardian Soc'y, 417 F. Supp. 2d 449, 458 (S.D.N.Y. 2006)) (internal quotation marks and

citations omitted). "Common ownership standing alone does not bring unrelated activities within the scope of the same enterprise." 29 C.F.R. § 779.211 (providing guidance on whether activities are related for the purposes of aggregation of annual revenues). Different business entities engage in related activities if they are operationally interdependent and provide "mutually supportive service[s] to the substantial advantage of each entity." Bowrin, 417 F. Supp. 2d at 458-59 (quoting Archie v. Grand Cent. P'shp, 997 F. Supp. 504, 525 (S.D.N.Y. 1998) (internal quotation marks omitted).

Plaintiff argues that Realty and the Delis engaged in related activities and operated under unified control. Plaintiff asserts that Palma owned and controlled both Realty and Delis as part of an amalgamated family enterprise and that Realty provided preferential rent to the Delis while the Delis provided employees to clean and repair the Building. Plaintiff avers that the use of the Deli employees was necessary because no financial records support Defendants' testimony that Defendants compensated Rivera to clean the Building. Plaintiff has not, however, met his burden of proffering evidence from which a reasonable jury could find that Realty and either Deli shared a common business purpose.

A common business purpose "encompass[es] activities [or business systems] . . . which are directed to the same business objective or to similar objectives in which the group has an interest." 29 C.F.R. § 779.213. A finding of a common business purpose generally requires evidence of two entities engaging in complementary businesses that are substantially operationally interdependent. Reich v. Bay, 23 F.3d 110, 115-16 (5th Cir. 1994). Examples of entities sharing a common business purpose include affiliated non-profit entities that seek to improve business conditions for a fee in different business improvement districts, Archie, 997 F. Supp. at 527-28, and a subcontractor whose supply of skilled labor to a related entity represented

over 90% of its business, <u>Reich</u>, 23 F.3d at 115-16. "More than a common goal to make a profit, however, must be shown to satisfy the requirement." <u>Brennan v. Veterans Cleaning Service, Inc.</u>, 482 F.2d 1362, 1367 (5th Cir. 1973); <u>see</u> <u>also</u> 29 C.F.R. § 779.212 (stating that, generally, commonly-owned retail and construction businesses do not share a common business purpose).

Here, Defendants characterize Realty's business objective as renting out space in the Building to both commercial and residential tenants and the Delis' business objectives as selling food and groceries at a profit. Plaintiff contends that both Realty and the Delis have the common business objective of deriving profit from the productive use of space within the Building. Plaintiff further argues that "[t]he common business purpose of the entities is the operation of the Building, in its entirety, for the profit of [Palma] and his family." (Pl.'s Reply Supp. Mem of Law in Further Opp'n to Defs.' Mots. for Summ. J., Docket Entry No 117, at 4.)

While the Delis require space in which to sell their products, it is not reasonable to characterize their principal business purpose as deriving profit from the use of that space, rather, as Defendants assert, they seek to make a profit from the sale of food products. <u>Cf.</u> <u>Rodriguez v. Shan Namkeen</u>, No. 3:15-CV-3370-BK, 2017 WL 2118345, at *5 (N.D. Tx. May 15, 2017) (holding that a laundromat and food manufacturer under common control did not share a common business purpose despite operating on the same real estate and occasionally sharing employees). Furthermore, despite evidence that each business gained some benefit from the facilities or labor of the other, Plaintiff does not proffer facts from which the Court could infer that the operations of each business were truly interdependent—that the operations of either business were dependent upon or primarily intended to support the other. <u>See</u> <u>id.</u> at *4-5 (finding that sharing some employees and facilities does not demonstrate the operational interdependence needed to show a common business purpose). Plaintiff's assertion that Realty and the Delis'

business objective was to benefit Defendants' purportedly amalgamated family business is simply a statement that both business worked to profit their owners, which is not a cognizable common business purpose.  See Brennan 482 F.2d 1362, 1367 ("More than a common goal to make a profit, however, must be shown to satisfy the requirement.").  Accordingly, Plaintiff has failed to frame a genuine issue of material fact as to whether Realty was an FLSA-covered employer at the relevant times, and Realty is entitled as a matter of law to dismissal of Plaintiff's FLSA claims against it.

Statute of Limitations

Defendants next argue that the FLSA's two-year statute of limitations bars all of Plaintiff's claims regarding conduct that took place before August 2013.  Plaintiff contends that the two-year statute of limitations should be extended to three years, as provided by 29 U.S.C. section 255(a), because Defendants' FLSA violations were willful.  Plaintiff argues that an inference of willful conduct is warranted because Collado consulted an attorney about PGC's wage and recordkeeping practices, Plaintiff was severely underpaid and paid in cash, and Defendants can be deemed to have known of the FLSA's requirements owing to their long experience running grocery stores.

To demonstrate that a defendant acted willfully, a plaintiff bears the burden of establishing that the defendant "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA."  McLaughlin v. Richland Shoe Co., 486 U.S. 128, 130 (1988) (quoting and affirming 799 F.2d 80, 83 (3d Cir. 1986)) (quotation marks and emphasis omitted); Young v. Cooper Cameron Corp., 586 F.3d 201, 207 (2d Cir. 2009) ("The burden is on the employee to show willfulness.").  This standard requires that a plaintiff demonstrate more than that "the defendant should have known it was violating the law, . . . [but] involves actual

knowledge of a legal requirement, and deliberate disregard of the risk that one is in violation."

Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 937-38 (S.D.N.Y. 2013) (quoting

Damassia v. Duane Reade, Inc., No. 04-CV-8819(GEL), 2005 WL 1214337, at *3 n. 2 (S.D.N.Y.

May 20, 2005)) (internal quotation marks omitted).  A defendant's extensive experience in an

industry does not, alone, support an inference that she was aware of the FLSA's requirements.

Eschmann v. White Plains Crane Serv., No. 11-CV-5881 (KAM) (VVP), 2014 WL 1224247, at

*6 (E.D.N.Y. Mar. 24, 2014) (finding, except for one default judgment decision in which all

allegations were deemed admitted, an absence of authority for the proposition that an

"employer's length of time in business or number of years of experience," implies a knowledge

of applicable employment law).

   Because an employer who acts to determine its legal obligations under the FLSA

in a non-reckless manner does not willfully violate the FLSA, employers may preclude a finding

of willfulness if they demonstrate that they consulted with an attorney or accountant who advised

them that the practice in question was lawful.  See McLaughlin, 486 U.S. at 135 n.13 (noting that

when an employer reasonably, or even unreasonably but not recklessly, works to determine its

legal obligations under the FLSA, any violations of the statute may not be deemed willful); see,

e.g., Pignataro v. Port Auth., 593 F.3d 265, 273 (3d Cir. 2010) (finding that the classification of

certain employees was not willful when it was based upon consultation with the defendant's

legal department).  Although Collado has generally proffered that she consulted and worked with

an attorney/consultant on pay methods, Defendants have proffered no specific evidence that she

was advised that PGC's pay practices were legally complaint.  The burden of proving willfulness

is on Plaintiff, however.

Here, Plaintiff argues that the Court should infer from the evidence of Collado's consultation with Mund about her pay practices, the specific content of which is not disclosed in the record, that Mund advised Collado that her actions violated the FLSA and that she must have disregarded that advice.  Although the mere fact that Collado consulted with an attorney may not be sufficient to establish conclusively that Collado sought in good faith to determine her legal obligations with respect to the particular FLSA violations alleged,  that fact alone is also insufficient to support a reasonable conclusion that Mund advised Collado that she was not in compliance with the FLSA and that she then disregarded his advice.  Cf. June-Il Kim v. SUK Inc., No. 12-CV-1557(ALC), 2014 WL 842646, at *6-7 (S.D.N.Y. Mar. 4, 2014) (Failure to consult with an attorney, inter alia, was "[a]t best, . . . negligence, but a willful violation requires more.").  Nor is the Court persuaded by Plaintiff's arguments, for which he cites no authority, that Defendants' payment of wages in cash or the magnitude of the alleged violation is indicative of their knowledge and willful disregard of the FLSA's requirements.

Because Plaintiff has failed proffer evidence sufficient to demonstrate that the conduct of any Defendant was willful, or even that there is any genuine issue of material fact in that regard, Defendants' motion for summary judgment is granted insofar as all federal claims against Defendants are time barred with respect to violations allegedly committed before August 2013.

Other Moving Defendants' Employer Status — FLSA Claims

Defendants argue that all remaining federal claims against PGC, Collado, and Palma must be dismissed because they and Plaintiff did not maintain an employer-employee relationship within the meaning of the FLSA in or after August 2013.

<u>Legal Standard</u>

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C.S. § 203(d) (LexisNexis 2013). The FLSA defines "employ" as (including) "to suffer or permit to work." 29 U.S.C.S. § 203(g) (LexisNexis 2013). "This is the broadest definition of employ that has ever been included in any one act . . . and it encompasses working relationships, which prior to the FLSA, were not deemed to fall within an employer-employee category." <u>Zheng v. Liberty Apparel Co.</u>, 355 F.3d 61, 69 (2d Cir. 2003) (internal quotation marks, alterations, and citations omitted).

"The regulations promulgated under the FLSA expressly recognize that a worker may be employed by more than one entity at the same time." <u>Zheng</u>, 355 F.3d at 66 (citation omitted). "[E]ven when one entity exerts 'ultimate' control over a worker, that does not preclude a finding that another entity exerts sufficient control to qualify as a joint employer under the FLSA." <u>Barfield v. N.Y.C. Health & Hosps. Corp.</u>, 537 F.3d 132, 148 (2d Cir. 2008) (citation omitted). On the other hand, "companies that are part of an 'integrated enterprise' or 'engaged in a joint venture' may nevertheless employ separate people and, absent control, are not liable for the separate employees of joint ventures." <u>Lopez v. Acme American Environmental Co., Inc.</u>, No. 12CIV511-WHP, 2012 WL 6062501, at *4 (S.D.N.Y. Dec. 6, 2012) (citation omitted). "The mere fact that each [c]orporate [d]efendant is owned in whole or major part by the same persons simply does not permit [the] [c]ourt to disregard their distinct legal statuses." <u>Paz v. Piedra</u>, No. 09CIV03977-LAK-GWG, 2012 WL 121103, at *7 (S.D.N.Y. Jan. 12, 2012), <u>Report and Recommendation adopted</u>, No. 09-CV-3977 (Docket No. 185).

"The [Supreme] Court has instructed that the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in

economic reality rather than technical concepts, . . . determined by reference not to isolated factors, but rather upon the circumstances of the whole activity." Barfield, 537 F.3d at 141 (internal quotation marks and citations omitted). The Second Circuit has established "different sets of relevant factors [for courts to consider] based on the factual challenges posed by particular cases." Id. at 142. In Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984), the Second Circuit held that, to determine whether an alleged employer had the power to control the workers in question, a court should weigh: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." However, "[n]o one of the four [Carter] factors standing alone is dispositive." Herman v. RSR Sec. Servs., 172 F.3d 132, 139 (2d Cir. 1999). Furthermore, employer "status does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees. Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA." Id. at 140.

In Zheng v. Liberty Apparel Co., the Second Circuit "observed that although the four Carter factors might be sufficient to establish an employment relationship, 'a positive finding on those four factors' is not necessary . . . [and it] established a six-factor test pertinent to assessing the 'economic realities' in a situation where an entity might have 'functional control' over workers even in the absence of the more formal control represented by the Carter factors." Doe I v. Four Bros. Pizza, Inc., No. 13CIV1505-VB, 2013 WL 6083414, at *7 (S.D.N.Y. Nov. 19, 2013) (quoting Zheng, 355 F.3d at 69) (internal quotation marks omitted). The factors articulated in Zheng are: "(1) whether the alleged employer's premises and equipment were used

for the Plaintiffs' work; (2) whether Plaintiffs shifted from one putative joint employer's premises to that of another; (3) the extent to which the work performed by Plaintiffs was integral to the overall business operation; (4) whether Plaintiffs' work responsibilities remained the same regardless of where they worked; (5) the degree to which the alleged employer or its agents supervised Plaintiffs' work; and (6) whether Plaintiffs worked exclusively or predominantly for one Defendant [and, like the Carter factors,] [n]o one factor is dispositive[.]'"[6] Gisomme v. Healthex Corp., No. CV 13-2541(LDW)(WDW), 2014 WL 2041824, at *3-4 (E.D.N.Y. May 15, 2014) (quoting Zheng, 355 F.3d at 71-72 and Wolman v. Catholic Health Sys. of Long Island, Inc., 853 F. Supp. 2d 290, 297 (E.D.N.Y. 2012), aff'd in part, rev'd in part sub nom. Lundy v. Catholic Health Sys. of Long Island Inc., 711 F.3d 106 (2d Cir. 2013)) (other internal quotation marks and citations omitted). "The analysis of these factors is holistic, and the court is also free to consider any other factors it deems relevant to this assessment of the economic realities." Duarte v. Tri-State Physical Med. & Rehab., P.C., No. 11 CIV 3765 NRB, 2012 WL 2847741, at *7 (S.D.N.Y. July 11, 2012) (quoting Zheng, 355 F.3d at 72) (internal quotation marks omitted). The Court now examines Plaintiff's contentions with respect to each remaining Defendants' employer status during the period following August 2013.

Palma

Material disputed issues of fact preclude summary judgment in Palma's favor on the issue of whether he was Plaintiff's employer at any time in or after August 2013. Although Palma maintains that he resided in the Dominican Republic, rarely visited the United States,

---

[6]     The Zheng factors were originally developed to determine whether an employee of an industrial subcontractor was also an employee of the prime contractor, but the test has been adopted to address other joint employment situations. See e.g. Hart, 967 F. Supp. 2d at 939-43.

exercised no control over the Deli, and had given the business to Junior Palma, the record includes evidence that, construed in the light most favorable to Plaintiff, could support a finding of employer status. Defendants' joint response to Plaintiff's interrogatories proffers Defendants' belief that Palma (at least partially) supervised Plaintiff, exercised control over his wages, and "prepared and/or distributed paychecks," including while Plaintiff worked at Mis Hijos.[7] (Responses to Interrogatories Nos. 4, 8, 12.) Plaintiff also points to evidence that Palma received a salary greater than Junior Palma, who Defendants assert was the true owner and manager of Mis Hijos, and to Palma's representations in a filing for Mis Hijos with the Division of Alcoholic Beverage Control that he was the on-site manager and devoted 50 hours per week to Mis Hijos.

Palma need not consistently have exercised powers as an employer to maintain that status, see Herman, 172 F.3d at 140, and Defendants have cited no authority for the proposition that an employer must be physically present to supervise an employee, set his work schedule, or exercise control over his wages. While Defendants offer plausible arguments to reconcile the evidence in Palma's favor, credibility determinations are not appropriate at the summary judgment phase. See Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). Plaintiff has thus raised genuine issues of material fact as to Palma's control over Plaintiff's work schedule, wages, and conditions of employment in and

---

[7] Plaintiff also points to his own testimony to show that Palma was involved in approving his hiring, setting his wages from the Deli, and approving Plaintiff's consumption of Deli food for lunch. These allegations raise a genuine issue of material fact as to whether Palma had the power to hire Plaintiff, affect his conditions of employment, and determine his wages, and thus whether Palma was Plaintiff's employer under Carter while Plaintiff worked at PGC.

after June 2013.  Therefore the Court denies Defendants' motion for summary judgment to the extent it seeks the dismissal of Plaintiff's remaining FLSA claims against Palma.

Collado

Defendants do not dispute that Collado was Plaintiff's employer while he worked at PGC, but they contend that she thereafter "gave up" the store, surrendered PGC's lease, and had no involvement with Mis Hijos, which replaced PGC by June 2013.  Plaintiff has not tendered evidence sufficient to frame a material fact issue as to whether Collado was Plaintiff's employer while he worked for Mis Hijos.  Plaintiff points only to Mund's ledger entitled "Mis Hijos Deli Corp.," which indicates that, in 2014, Mund prepared corporate tax returns for Realty and Mis Hijos and personal returns for Palma, Collado, and Junior Palma.  Plaintiff invites the Court to infer that Mund was paid to prepare Collado's taxes by Mis Hijos, which Plaintiff asserts would support a finding that Collado had an ongoing relationship with Mis Hijos and Palma and continued to function as Plaintiff's employer.  Plaintiff's theory is too speculative to raise a genuine issue of fact.  Even assuming that Mis Hijos was providing personal accounting services to Collado, the provision of such a benefit is not evidence that Collado had any of the powers or responsibilities with respect to Plaintiff's employment on which employer status turns under the Carter test.  See Carter, 735 F.2d at 12; see also Irizarry v. Catsimatidis, 722 F.3d 99, 111 (2d Cir. 2013) ("Ownership or a stake in a company, is [alone] insufficient to establish that an individual is an 'employer.'").   Because Plaintiff has not proffered sufficient evidence from which a reasonable factfinder could conclude that Collado was Plaintiff's employer while he worked at Mis Hijos, the Court grants the motion for summary judgment to the extent it seeks dismissal of Plaintiff's FLSA claims against Collado.

<u>PGC</u>

Plaintiff also appears to argue that PGC continued to employ Plaintiff after Mis Hijos began operations in June 2013.  Plaintiff contends that, in practice, the management and ownership of the two Delis was identical, but offers no evidence that PGC had any control over Plaintiff, his schedule, his wages, or his payroll records after June 2013.  Defendants' motion for summary judgment is therefore granted with respect to Plaintiff's FLSA claims against PGC for conduct after June 2013.

<u>Moving Defendants' Employer Status — NYLL Claims</u>

Moving Defendants also urge the Court to dismiss the NYLL claims against Collado, PGC, and Palma on the basis that they were not Plaintiff's employers under state law. The NYLL defines an employer as an entity or person "employing any individual in any occupation, industry, trade, business or service."  N.Y. Lab. Law § 190(3).  Although the Second Circuit has observed that the New York Court of Appeals has not yet determined whether the term employer has the same meaning under both state and federal law, <u>see</u> <u>Irizarry</u>, 722 F.3d at 117, district courts have given the term a consistent interpretation under both statutes unless a party advances an argument that "any difference would be material to the facts of the case." <u>Kalloo v. Unlimited Mech. Co. of NY</u>, 977 F. Supp. 2d 187, 201 (S.D.N.Y. 2013).  Because Plaintiff does not contend that the analysis would be any different under the NYLL, the Court dismisses Plaintiff's claims against Collado and PGC to the extent they involve Plaintiff's employment occurring after June 2013.  The Court similarly denies summary judgment with

respect to the state law claims against Palma for substantially the reasons set forth above in connection with Plaintiff's FLSA claims.[8]

Realty

Although Plaintiff has not demonstrated that Realty, as an enterprise, is engaged in a sufficient volume of commerce to be covered by the FLSA, the Court must examine whether it functioned as Plaintiff's employer for the purposes of NYLL.  As explained above, Plaintiff has already raised genuine issues of material fact as to the degree of control Palma exercised over the conditions of Plaintiff's employment and his duties at the Delis.  Based on Palma's ownership of Realty, the Department of Housing Preservation and Development forms listing Junior Palma as the on-site manager of the Building, and Plaintiff's testimony that Junior Palma directed him when to work at the Building, a reasonable jury could conclude that Palma and Junior Palma directed Plaintiff's duties and work schedule in the building as agents of Realty, rather than as agents of either Deli.  See Hart, 967 F. Supp. 2d at 941-43 (finding a genuine issue of material fact as to whether the actions of the common manager of two related companies could support imputation of joint employer status to a defendant if the managers' actions were taken on behalf of that defendant, rather than the direct employer).

Plaintiff has also proffered evidence from which a factfinder could infer that several of the other Zheng factors were met.[9]  Plaintiff testified that he was sent to work in

---

[8]     Plaintiff has also raised genuine issues of material fact with respect to Palma's employer status prior to June 2013.  See supra note 7.

[9]     In Zheng, the Second Circuit set forth the following non-exclusive factors that may indicate joint-employer status: "(1) whether the alleged employer's premises and equipment were used for the Plaintiffs' work; (2) whether Plaintiffs shifted from one putative joint employer's premises to that of another; (3) the extent to which the work performed by Plaintiffs was integral to the overall business operation; (4) whether Plaintiffs' work responsibilities remained the same regardless of where they worked; (5) the degree to which the alleged employer or its agents supervised Plaintiffs' work; and

Realty's portion of the Building three to four times per week, which might have represented a substantial portion of his work time, and that, when he was not available, his Building duties would shift to another Deli employee, thereby addressing the first and second factors.  He also performed similar cleaning duties at the premises of both Realty and the Delis (although he had a somewhat broader set of duties at the Delis) that were integral to the operation of the Building, furthering Realty's primary function of providing habitable dwellings, thereby addressing the third and fourth factors.  Plaintiff has thus raised a genuine issue of material fact as to whether Realty was his joint employer under NYLL and the Court accordingly denies Defendants' motion for summary judgment as to Plaintiff's NYLL claim against Realty.[10]

CONCLUSION

For the foregoing reasons, Moving Defendants' motions for summary judgment are granted as to Plaintiff's FLSA claims against Realty, Collado, and PGC, but are denied with respect to Plaintiff's FLSA claims against Palma that arise from events in or after August 2013.  Defendants' motions for summary judgment are granted with respect to Plaintiff's NYLL claims against PGC and Collado to the extent they are based on conduct occurring after June 2013, but are denied in all respects as to the NYLL claims against Palma and Realty, and are denied in all other respects.

---

(6) whether Plaintiffs worked exclusively or predominantly for one Defendant [and, like the Carter factors,] [n]o one factor is dispositive[.]"  Gisomme, 2014 WL 2041824 at *3-4 (quoting Zheng, 355 F.3d at 72 and Wolman, 853 F. Supp. 2d at 297 (E.D.N.Y. 2012)) (other internal quotation marks and citations omitted).

[10]    Having found genuine issues of material fact as to whether Realty is liable as a joint-employer under NYLL, the Court declines to consider Plaintiff's alternative theories to establish an employer-employee relationship.

The following claims against the Moving Defendants remain to be adjudicated at trial: (1) FLSA claims against Palma predicated on conduct after August 2013; (2) all NYLL claims against Palma; (3) NYLL claims against Realty; and (4) any NYLL claims against Collado and PGC arising from conduct prior to July 2013.

Docket Entry Nos. 70, 74, and 79 are hereby resolved.

The Parties are directed to meet promptly with Magistrate Judge Freeman for settlement purposes.

The final pre-trial conference will be held on **January 25, 2019**, at **12:00 p.m.** in **Courtroom 17C**. The parties must confer and make their pre-conference submissions as required by the Pre-Trial Scheduling Order (Docket Entry No. 91).

SO ORDERED.

Dated: New York, New York
          September 27, 2018

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge